UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

UNITED STATES OF AMERICA,

         – against –

ABDUL MUTALIB OSMAN,

                       Defendant.

---------------------------------------------------------------

**MEMORANDUM & ORDER**

23-CR-97 (MKB)

MARGO K. BRODIE, United States District Judge:

Defendant Abdul Mutalib Osman is charged in a one-count indictment with visa fraud in violation of 18 U.S.C. §§ 1546(a), 2, and 3351, *et seq.*  (Indictment ¶ 1, Docket Entry No. 12.) On September 29, 2023, Osman moved to suppress statements made to law enforcement officers during a *Mirandized* interview at John F. Kennedy International Airport ("JFK") on December 3, 2022.  (Def.'s Mot. to Suppress ("Def.'s Mot."), Docket Entry No. 21.)[1]  Osman alleges that his lack of English proficiency precluded him from validly executing a waiver of his rights under *Miranda v. Arizona* and that his statements were therefore elicited in violation of his rights under the Fifth Amendment.  (Def.'s Mot. 2–3, 6.)  On December 6, 2023, the Court held a hearing. (Min. Entry dated Dec. 6, 2023; Tr. of Suppression Hr'g held on Dec. 6, 2023 ("Tr.") 1, Docket Entry No. 34.)  At the hearing, the Court heard testimony from Customs and Border Protection

---

[1] The parties submitted pre-hearing briefing on the motion to suppress.  (Def.'s Mot. to Suppress ("Def.'s Mot."), Docket Entry No. 21; Gov't's Resp. in Opp'n to Def.'s Mot. ("Gov't Opp'n"), Docket Entry No. 23.; Def.'s Reply Mem. in Supp. of Def.'s Mot. ("Def.'s Reply"), Docket Entry No. 27.)  Osman also attached as an exhibit to his motion an affidavit in Hausa and an English translation.  (*See* Decl. in Hausa in Supp. of Def.'s Mot., Docket Entry No. 21-1; Decl. in English (Trans.) in Supp. of Def.'s Mot., Docket Entry No. 21-2.)

("CBP") Officer Egbert Simon and United States Attorney's Office Intelligence Analyst Sarah Wenner, viewed video footage of the Defendant's interactions with law enforcement officers on December 3, 2022, and reviewed screenshots and clips of videos from the Defendant's social media accounts.[2] (*See* Minute Entry dated Dec. 6, 2023; Tr. 5–79.) Osman did not testify at the December 6, 2023 hearing, but submitted a supplemental affidavit attesting to various disputed facts. (Def.'s Aff. in Supp. of Def.'s Mot. to Suppress ("Def.'s Suppl. Aff."), Docket Entry No. 29.)[3] The parties submitted additional briefing following the hearing.[4]

For the reasons discussed below, the Court denies Osman's motion.

## I.    Background

### a.    Osman's arrival at JFK Airport

On December 3, 2022, Osman arrived at JFK Airport after an approximately ten-hour

---

[2] The Court finds that the Government's exhibits of Osman's social media accounts, received into evidence as Government's Exhibits 201–17, (*see* Tr. 48:12–63:13), do not assist the Government in meeting its burden to show, by a preponderance of the evidence, that Osman knowingly, intelligently, and voluntarily waived his right against self-incrimination. *See United States v. Mendonca*, 88 F.4th 144, 164 (2d Cir. 2023) (citing *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991)); *see also Berghuis v. Thompkins*, 560 U.S. 370 (2010) ("[T]he burden to establish waiver [is] by a preponderance of the evidence." (citing *Colorado v. Connelly*, 479 U.S. 157, 168 (1986))). The Government has not shown, in the first instance, that Osman actually authored the text attributed to him. Further, even if Osman did author the posts attributed to him, the level of English aptitude reflected in the social media posts does not demonstrate that Osman is proficient in English.

[3] The Government contends that the Court should not consider or should afford no weight to Osman's supplemental affidavit. (Gov't Letter Br. re: Suppression H'g. 5–7 ("Gov't Suppl. Br."), Docket Entry No. 30.) The Court discusses Osman's supplemental affidavit *infra* at section I.d.

[4] (Gov't Suppl. Br.; Def.'s Suppl. Mem. in Supp. of Def.'s Mot. to Suppress ("Def.'s Suppl. Mem."), Docket Entry No. 31; Gov't's Reply in Opp'n to Def.'s Suppl. Mem. ("Gov't Suppl. Opp'n"), Docket Entry No. 32; Def.'s Reply Mem. in Supp. of Def.'s Mot. ("Def.'s Suppl. Reply"), Docket Entry No. 33.)

flight from Accra, Ghana.[5]  At the primary passport control screening, Osman stated his intention

to seek asylum in the United States.  Osman proceeded to "preliminary secondary questioning,"

where he told two CBP officers that he was seeking asylum and explained that "he was going to

be killed" in Ghana "because he was gay."[6]  (Def.'s Mot. 1–2.)  After approximately one to two

hours, Osman was taken to an interview room for questioning by other law enforcement officers.

   **b.   Osman's *Miranda* waiver**

   In the interview room, Osman was introduced to Diplomatic Security Service ("DSS")

Agent Alison Pierce and CBP Officer Egbert Simon.  Both Agent Pierce and Officer Simon were

wearing civilian clothes and neither appeared to be carrying a firearm.  Agent Pierce told Osman

that she would like to ask him some questions, but that she had to first read him his rights and

that he had to agree to speak with the officers.

   Agent Pierce introduced herself as "Alison" and asked Osman's name.[7]  He responded,

"Abdul Mutalib."  She explained that she was "with Diplomatic Security Service, so, the State

Department, right?"  She stated, "I'm just going to show you my credentials so you know that

I'm a real person."  Agent Pierce showed Osman her identification but did not show him her

badge, before saying, "Ok, good?"  Osman responded, "Nice to meet you."[8]  Agent Pierce

---

[5]  The following facts are undisputed unless otherwise noted.

[6]  There is no video of Osman's interim questioning at "preliminary secondary questioning."  At the hearing, Officer Simon testified that during the preliminary secondary questioning, "[Osman] stated that he had fled his home country because they had found out about his sexual orientation and that because that happened, he was in danger."  (Tr. at 11:9–11.)

[7]  (*See* Osman Interview Video 0:20–0:28, received into evidence as Government's Exhibit 102 at the Hearing held on Dec. 6, 2023 (Tr. 34:17–35:20) (hereinafter "GX 102").)  All facts and quotations in this section represent the Court's findings of fact regarding statements made by Osman, Agent Pierce, and Officer Simon in GX 102 and all citations are omitted.

[8]  Osman's responses were at times soft-spoken, subdued, and mumbled.

continued: "At this point, I'm just going to read you your rights because you are in America, right?  So, you have the rights of every other American citizen at this point in time, so you have these rights the minute you land here, okay?"  She then asked, "Do you speak English?"  Osman responded, "Yes."  She asked, "Do you understand English?"  Osman responded, "Yes, I understand English."  Indicating to a *Miranda* waiver form, Agent Pierce asked, "So, if I read this to you — you'll understand?"  Osman responded, "Yeah."

Agent Pierce stated, "You have the right to remain silent."  Osman responded, "Alright."  She explained, "Which means you don't have to talk to us."  Osman indicated that he did not understand.  She repeated, "You have the right to remain silent."  Osman responded, "Remain silent?"  "Yeah, like you don't have to talk," explained Agent Pierce.  Osman responded, "I don't have to talk."  Agent Pierce clarified, "Right.  That's what that means."  Osman responded, "Ahh, okay.  I have to remain silent."  "You have the right to remain silent," repeated Agent Pierce.  Osman confirmed, "I have the right to remain silent."[9]

In addressing the next *Miranda* right, Agent Pierce stated, "Next one is: anything you say can — can be used against you in the court of law.  So, like, if anything goes to court, anything you say, or we talk about, can be used against you in your case.  For or against you.  Does that make sense?"  Osman responded, "I understand," but continued, "like . . . police person . . . do you?" and trailed off.  "Anything you say can be used against you — can and will be used against you in the court of law," Agent Pierce repeated.  Osman responded, "Ahh, in the courts."  Agent Pierce confirmed, "Yes, in the U.S. courts."  Osman repeated, "In the U.S. courts."

---

[9]  Contrary to Osman's assertion that he stated here, "I have the right to asylum," (Def.'s Mot. 2), the Court finds that he stated, "I have the right to remain silent."  At no point during this colloquy does the Court find that Osman stated, "I have the right to asylum."

Agent Pierce next told Osman, "You have the right to a lawyer — to have a lawyer with you." Osman responded, "Okay." She continued, "If you can't afford one, one can be appointed to you. Does that make sense?" Osman responded, "Like, if I have a lawyer? Or you appoint lawyer for me? Or?" At this point, Officer Simon interjected, "So, if you don't have the money to get a lawyer, the court will give you a lawyer." Osman responded, "Oh, the court will give me [one]. Okay." Agent Pierce continued, "And you have the right to have a lawyer during any questioning. Okay? So, any questioning that we do, you have the right to have a lawyer present." Osman responded, "Okay."

Agent Pierce further explained, "And then the last one is, if you can't afford a lawyer, one will be appointed to you and he or she will represent you, free of charge, prior to any questioning. Does that make sense?" While Agent Pierce was speaking, Osman repeated, "Represent me. Okay." Afterwards, Osman answered, "Yeah," to her question of whether that made sense. Agent Pierce summarized, "You have the right to not talk, you have the right to a lawyer." Osman responded, "I have the right to talk. I have the right to my lawyer to talk with — without me. Okay, I understand." Finally, Agent Pierce said, "So, at this time, I can't talk to you unless you waive those rights, in this room. So, are you willing to talk to us today?" Osman responded, "I can talk."

It took Agent Pierce and Officer Simon approximately five minutes to introduce themselves and to explain the *Miranda* warnings to Osman. At no point was Osman offered an interpreter nor did Osman ask for an interpreter.

### c.   Osman's *Mirandized* interview

After explaining the *Miranda* warnings, Agent Pierce and Officer Simon proceeded to question Osman for approximately an hour. The Court summarizes below details of the

questioning to the extent that the questions and Osman's responses are relevant to understanding (1) whether Osman's English comprehension was sufficient to enable him to validly waive his *Miranda* rights and, (2) whether Osman was misled as to the purpose of the questioning such that the waiver was not knowing or voluntary.

Agent Pierce began by stating, "We have some questions about your documentation.  And we know you talked to the lady.  So, if you could just give me the same story that you told her, we'll be able to write this up for you, okay?"  Agent Pierce then asked Osman how he got the visa:

> PIERCE:   So go ahead and tell me how you got this document.
>
> OSMAN:   It's one called Nabil. [. . .]  In Libya.  [. . .]
>
> PIERCE:   What's Nabil's last name?
>
> OSMAN:   This is the only name I know.  Nabil.
>
> PIERCE:   How did Nabil get that for you?
>
> OSMAN:   Nabil, he gave everything to me . . .  He want to help me.
>
> PIERCE:   Why did he want to help you?
>
> OSMAN:   He's my friend.  [Unintelligible.]

Agent Pierce then asked Osman whether he knew the document was fake and how Nabil got the document.

> PIERCE:   Did you know that this was fake?
>
> OSMAN:   I don't know.  I'm not . . . immigration . . . I don't know . . .
>
> PIERCE:   How did Nabil get the document?
>
> OSMAN:   He asked me for a picture.  He did everything.
>
> PIERCE:   And he asked you for all of your documentation, right?  He asked you for your passport and stuff — you provided Nabil the passport and your photo?
>
> OSMAN:   Yeah, and the photo.
>
> PIERCE:   And where did Nabil get this?  Like, where did he get it?
>
> OSMAN:   Like?

6

| PIERCE: | Like, in Libya?  What city? |
|---|---|
| OSMAN: | In Libya.  Libya, Tripoli. |
| PIERCE: | At what building?  Was it, like, the embassy? |
| OSMAN: | No, no, not embassy. |
| PIERCE: | Where? |
| OSMAN: | We always meet at the coffee shop. |
| PIERCE: | He got this at a coffee shop? |
| OSMAN: | No, me and him meet at the coffee shop sometimes.  Where he go and get this — I don't know. |
| PIERCE: | When you see Nabil, you meet at a coffee shop? |
| OSMAN: | Yeah. Always at the coffee shop. |
| SIMON: | Do you remember the name of the coffee shop?  The name of the coffee shop? |
| OSMAN: | No, no, I don't remember. |
| PIERCE: | But it's in Tripoli? |
| OSMAN: | Yeah. |

Agent Pierce then asked Osman when he received the visa and whether he paid for it.

| PIERCE: | When did you get this? |
|---|---|
| OSMAN: | I get this maybe, almost ten days [ago]. |
| PIERCE: | Ten days? |
| SIMON: | The 23rd or the 22nd? |
| OSMAN: | Yeah? |
| PIERCE: | He handed it to you in the coffee shop? |
| OSMAN: | Yeah.  He brought it . . . we meet there and he gave me my passport. |
| PIERCE: | Did you pay for this?  Did you pay money? |
| OSMAN: | No, no.  He didn't charge me anything. |

Agent Pierce then asked Osman about his airline ticket and whether he paid for the ticket.

| PIERCE: | When did you buy your ticket to come here? |
|---|---|
| OSMAN: | [Nabil] did everything. |

7

| PIERCE: | Did he say when he bought the ticket? |
|---|---|
| OSMAN: | The date? |
| PIERCE: | When did he buy the ticket? |
| OSMAN: | That I don't know.  Of course, I lost — I sell my [unintelligible] — ticket price — I sell my phone at the airport because I don't have money. |
| PIERCE: | It's on your phone? |
| OSMAN: | No, I don't have phone now.  I don't have. |
| PIERCE: | You didn't come with any phone?<br>[To Officer Simon:] Do we have a phone? |
| OSMAN: | I sell it.  I sell it. |
| PIERCE: | You sold the phone?  How much did you sell the phone for?  How much money did you get? |
| OSMAN: | In Ghana currency, maybe 2,500. |
| PIERCE: | 2,500— |
| OSMAN: | Cedi. Cedi.  Not dollars. |
| PIERCE: | Right. In Ghanaian — |
| OSMAN: | Ghanaian currency. |
| PIERCE: | Why did you sell your phone? |
| OSMAN: | I needed money. |

(GX 102 at 3:10–8:37.)  At this point, Officer Simon stepped out of the room for approximately one minute.  Agent Pierce explained that she would wait for Officer Simon to return before asking any more questions.  Osman asked if he could look at the *Miranda* waiver form and Agent Pierce responded, "Go ahead."  Osman appears to spend the next ten seconds looking at the *Miranda* waiver; but the Court cannot determine whether Osman was actually reading it.

Shortly thereafter, Agent Pierce asked, "How long was the flight you were on?"  Osman did not respond.  She asked again, "How long was the airplane — flight?" and mimicked a plane with her arm.  Osman responded, "Delta Airline."  Agent Pierce confirmed, "Delta.  But how

long?  Ten hours?"  Osman responded, "Ten hours.  Ten hours, forty-nine minutes."  Agent

Pierce followed up: "And you didn't have your phone the whole time?  What did you do on the

flight?"  Osman said, "I just watched movies on the . . ." and mimed a seatback screen.

Subsequent questioning established that Osman was to meet a man in Yonkers whom he

had never met before nor had they spoken on the phone.  Osman had received the individual's

contact information from Nabil in Libya.  Approximately twenty minutes into the questioning,

and after approximately five minutes without questioning because Agent Pierce was looking up

information on her computer and Officer Simon was looking for information on his phone,

Osman asked Officer Simon, "which . . . any problem [unintelligible] with me?"  Officer Simon

paused before responding to Osman, "I'm not going to make any statements on that."  Agent

Pierce indicated to Officer Simon that she had not understood Osman.  Officer Simon responded,

"He asked if there were any problems."  Agent Pierce then addressed her response to Osman:

"Oh.  We're just working through some stuff right now, okay?"  Osman replied, "Ahh, okay, no

problem."  Agent Pierce repeated, "We're just working through something — but we'll let you

know everything once we know, right?"

Later, after Osman indicated that he was cold and that his jacket was just outside the

interview room in his suitcase, Officer Simon escorted Osman to retrieve his jacket.

Immediately after, Officer Simon indicated that he needed to tell Agent Pierce something, and

they left Osman alone in the room.  Later on, they left a second time and Osman examined and

then picked up the *Miranda* form again, appearing to read it carefully.  When asked whether

Nabil explained to Osman what "the document [*i.e.*, his visa] was for and how to use it," Osman

offered a mumbled, unintelligible answer.  Officer Simon interpreted his response as saying it

was a "temporary residence permit."  Osman further explained that he read these words on the

visa and that he understood it to be a residence permit for the United States.  Osman indicated

that he did not understand and offered nonresponsive answers to subsequent questioning

regarding Osman's plans for his use of the visa upon his arrival in the United States.  In another

line of questioning, Agent Pierce and Officer Simon asked about a man Osman met at a mosque

in the airport in Accra.  Officer Simon and Agent Pierce asked whether this man purchased

Osman's ticket for the flight he took to come to the United States.  Osman said no, but also

indicated that he did not understand these questions.

Subsequently, Osman explained that he went to Libya because, in Ghana, he was

discovered in a hotel with another man and was therefore in danger of being killed due to his

sexuality.  Osman spent between five and ten years in Libya, returning secretly to Ghana from

time to time.  Upon discovering that Osman had a residency permit for Libya, Officer Simon

asked Osman, "Did you stop and think that you would need authorization or permission from the

U.S. government to have residency status in the United States?"  Osman did not understand,

responding, "I do not understand that question."  When later asked about his time in Libya,

Osman explained that he was involved in glasswork.  Officer Simon asked, "Like vases?"

Osman corrected him, "No, like windows," and demonstrated to a glass wall in the interview

room.  At the end of the questioning, the agents asked if Osman was hungry and if he had any

dietary restrictions.  Osman answered that he is Muslim and cannot eat pork, but that he does not

have any allergies.  After the questioning, Osman was placed under arrest.[10]  (Gov't Opp'n 3–4.)

---

[10]  Osman's arrest is not shown in the video footage of the interview.

### d.   Osman's contested affidavits

Osman submitted two affidavits in support of his motion to suppress.  The first, annexed to his motion, asserts *inter alia* that he did not understand his *Miranda* rights.  (*See generally* Def.'s Aff.)  For example, Osman states: "At the beginning of the interview, the female agent read me statements from a piece of paper about my rights.  I did not understand what she was telling me."  (*Id.* ¶ 6; *see also id.* ¶ 7 ("I did not know then, nor do I understand now, what it means to have 'the right to remain silent.'").)  Osman's second affidavit was filed with the Court at the suppression hearing on December 6, 2023.  This affidavit attests to various facts regarding Osman's interview, (*see* Def.'s Suppl. Aff. ¶¶ 1–7), and regarding his English comprehension more generally, (*see id.* ¶¶ 8–18).

The Government argues that the Court "should give no weight to *either* of [Osman's] declarations."  (Gov't Suppl. Opp'n 1–2.)  The Government argues that, because Osman "did not testify, and thus was not subject to cross-examination about his representations in *either* declaration[,] . . . *both* declarations contain untested statements deserving no weight."  (*Id.* at 2.) In support, the Government points to "[t]he fact that the declarations . . . contradict each other" to show "why neither declaration is credible."  (*Id.* comparing Def.'s Aff. ¶ 7 (claiming Osman asserted to agents, "I have the right to asylum") with Def.'s Suppl. Aff. ¶ 1 (claiming Osman only understands the word "right" in the context of "left and right")).)  Further, the Government points to case law recognizing that Osman's affidavit "may be an appropriate mechanism to create a factual dispute requiring a hearing in the first instance," but argues that "whether to give it weight at an evidentiary hearing is an entirely different question."  (Gov't Suppl. Br. 5 (first citing *United States v. Mathurin*, 148 F.3d 68, 70 (2d Cir. 1998); and then citing *United States v. Miller*, 382 F. Supp. 2d 350, 362 (N.D.N.Y. 2005)).)

Osman argues that the Court "has discretion to consider the facts stated in [his] supplemental declaration," and notes that "Federal Rule of Criminal Procedure 47 requires a party moving to suppress evidence to 'serve any supporting affidavit with the motion.'"  (Def.'s Suppl. Mem. 8 (quoting Fed. R. Crim. P. 47(d)).)  In support, Osman points to *United States v. Muyet*, 946 F. Supp. 302, 310 (S.D.N.Y. 1996), in which the court considered a supplemental affidavit filed after a suppression hearing, and argues the Court should do the same here.  (*Id.*)  Further, Osman argues that *United States v. Belloisi*, No. 20-CR-219, 2023 WL 2709879 (E.D.N.Y. Mar. 30, 2023), cited by the Government at the suppression hearing, is inapposite because that court declined to consider a supplemental affidavit on the grounds that it was "conclusory" and "self-serving."  (*Id.* (quoting *Belloisi*, 2023 WL 2709879, at *1).)  Osman contends that "those considerations do not apply in the instant case."  (*Id.* at 8–9.)

The Court considers Osman's initial affidavit, annexed to his motion, only insofar as it raises a genuine question regarding the validity of his *Miranda* waiver and thus demonstrated the need for a hearing on the issue.  *United States v. Robinson*, No. 16-CR-545, 2018 WL 5928120, at *3 (E.D.N.Y. Nov. 13, 2018) ("A defendant seeking a hearing on a suppression motion bears the burden of showing the existence of disputed issues of material fact." (citing *United States v. Pena*, 961 F.2d 333, 338 (2d Cir. 1992))).  Consistent with other courts, the Court affords greater weight to the live testimony from the witnesses presented at the hearing and subjected to cross-examination.  *See, e.g.*, *United States v. Choudhry*, 24 F. Supp. 3d 273, 275 n.1 (E.D.N.Y. 2014) (noting that a court may rely on hearsay and other evidence at suppression hearing, but distinguishing that from hearsay contained in a non-testifying defendant's affidavit); *United States v. Paulino*, No. 12-CR-799, 2013 WL 2237532, at *4 (S.D.N.Y. May 21, 2013) (placing greater weight on live testimony of law enforcement witnesses than defendant's declaration);

*Miller*, 382 F. Supp. 2d at 362–63 (finding that, absent live testimony from a defendant, a court should consider a defendant's hearsay affidavit, but the weight afforded to it "will be influenced by whether the affidavit is contradicted by more cogent evidence, especially that which withstands the scrutiny of cross-examination"); *see also United States v. Barret*, No. 10-CR-809, 2011 WL 6181489, at *2 (E.D.N.Y. Dec. 12, 2011) (considering the defendant's affidavit, but relying more heavily on the evidentiary record adduced at the suppression hearing).

As to Osman's supplemental affidavit, the Court considers it, but generally finds the attested facts to not be credible and does not afford them any weight. (*See generally* Def.'s Suppl. Aff.); *see also Belloisi*, 2023 WL 2709879, at *1 ("[The] Defendant did not testify at the suppression hearing or present any witnesses. . . . [Because the] Defendant did not testify and the credibility of the conclusory, self-serving statements in the affidavit could not be challenged, the Court does not consider it in deciding the instant motion."). For example, Osman states that he does not understand the meaning of the word "right" other than as being the opposite of "left." (Def.'s Suppl. Aff. ¶ 1.) Osman's *Miranda* colloquy reveals this statement to be patently incredible. Although Osman does not appear to demonstrate perfect comprehension of his *Miranda* rights as explained to him by Agent Pierce and Officer Simon, it is clear when he said, "I have the right to talk," and "I have the right to my lawyer to talk with," that his usage of the word "right" is not referring to a direction as opposed to a privilege.

## II.   Discussion

### a.   Standard of review

"In *Miranda v. Arizona*, the Supreme Court held that the 'in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not

otherwise do so freely.'" *Georgison v. Donelli*, 588 F.3d 145, 154 (2d Cir. 2009) (quoting *Miranda v. Arizona*, 384 U.S. 436, 467 (1966)); *see also Maryland v. Shatzer*, 559 U.S. 98, 103 (2010) ("In *Miranda v. Arizona*, the Court adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the 'inherently compelling pressures' of custodial interrogation." (citations omitted)). As a procedural safeguard, the Supreme Court established the now-familiar *Miranda* warnings, which it believed necessary "to secure the privilege against self-incrimination." *Donelli*, 588 F.3d at 154 (quoting *Colorado v. Spring*, 479 U.S. 564, 572 (1987)). "The purpose of the *Miranda* warning is to ensure that the person in custody has sufficient knowledge of his or her constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary." *United States v. Murphy*, 703 F.3d 182, 192 (2d Cir. 2012) (quoting *United States v. Carter*, 489 F.3d 528, 534 (2d Cir. 2007)). However, "[a]n interaction between law enforcement officials and an individual generally triggers *Miranda*'s prophylactic warnings [only] when the interaction becomes a 'custodial interrogation.'" *United States v. Vinas*, 910 F.3d 52, 60 (2d. Cir 2018) (quoting *United States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011)).[11]

Once a defendant provides a sufficient factual basis to warrant an evidentiary hearing on custodial statements, "the government bears the burden to establish 'by a preponderance of the evidence that a suspect waived his *Miranda* rights, and that his confession is truly the product of free choice' and thus admissible at trial." *United States v. Mendonca,* 88 F.4th 144, 164 (2d Cir. 2023) (quoting *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991)); *see also Berghuis v.*

---

[11] Although it is unclear whether Osman was in custody at the time he was questioned, the Court assumes for purposes of deciding the motion that Osman was in custody because he was read the *Miranda* warnings prior to questioning and because the Government does not argue otherwise.

*Thompkins*, 560 U.S. 370 (2010) ("[T]he burden to establish waiver [is] by a preponderance of the evidence." (citing *Colorado v. Connelly*, 479 U.S. 157, 168 (1986))).

In order to conclude that there has been a waiver, a court must find first that "the relinquishment of the right was 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and, second, that it was made with 'the requisite level of comprehension,' *i.e.*, 'a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *United States v. Medunjanin*, 752 F.3d 576, 586 (2d Cir. 2014) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)); *see also United States v. O'Brien*, 926 F.3d 57, 73 (2d Cir. 2019) ("[W]aiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and must be 'knowing[ ]' in the sense that it was 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" (quoting *Berghuis*, 560 U.S. at 382–83)).  A court must "look at the totality of circumstances surrounding a *Miranda* waiver and any subsequent statements to determine knowledge and voluntariness." *Mendonca*, 88 F.4th at 164 (quoting *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014)); *Medunjanin,* 752 F.3d at 586 ("[T]he court must consider 'the totality of the circumstances surrounding the interrogation.'" (quoting *Moran*, 475 U.S. at 421)).  The totality of the circumstances includes "the characteristics of the accused, the conditions of the interview, and the behavior of the law enforcement officials." *United States v. Conners*, 816 F. App'x 515, 518 (2d Cir. 2020) (citing *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018)).

"[A] lack of fluency in English does not automatically preclude a defendant from executing a knowing and voluntary waiver of rights in that language." *United States v. Amanor*,

No. 15-CR-79, 2015 WL 13344076, at *4 (E.D.N.Y. June 16, 2015) (quoting *United States v. Ocasio*, 80 F. App'x 127, 129 (2d Cir. 2003)).  The Second Circuit has found that a defendant "understood English sufficiently well to comprehend the *Miranda* warnings" where, among other things, the agent "who read the *Miranda* warnings testified that he paused after each line to ask [the defendant] whether he understood the warning and that after each such inquiry [the defendant] either nodded his head up and down or responded 'yes.'"  *United States v. Yilmaz*, 508 F. App'x 49, 53 (2d Cir. 2013).  In another case, the Second Circuit affirmed denial of suppression where the defendant told the officer that he spoke English and where the officer "testified that [the defendant] had responded appropriately to the questions put to him during the subsequent investigatory interview, and that [the defendant] was able to answer his questions." *United States v. Diallo*, 206 F. App'x 65, 66 (2d Cir. 2006).[12]

> **b.   The Government has met its burden to show, by a preponderance of the evidence, that Osman knowingly, intelligently, and voluntarily waived his *Miranda* rights**

Osman raises three principal objections to his purportedly invalid *Miranda* waiver.  First, he argues that his "lack of English comprehension" prevented him from validly waiving his rights under *Miranda*.  (Def.'s Mot. 2–3.)  Second, he argues that his confusion as to the purpose of the interrogation tainted any potential waiver.  (*Id.* at 5–6.)  In support, Osman asserts that "he thought he was speaking to law enforcement about asylum," and therefore "lacked any awareness of the nature of the rights he was abandoning."  (*Id.*)  Third, Osman argues that law

---

[12]   *See also United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (finding that the "ability to give a knowing and voluntary waiver was not compromised" where, among other things, the defendant was "found to have a reasonably good command of the English language" and the *Miranda* warnings were given in English); *Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir. 1989) ("[A]lthough [the defendant] spoke in broken English with an accent and occasionally lapsed into Spanish, his command of English was sufficient for him to have understood the *Miranda* warnings given to him.").

16

enforcement affirmatively "misled him into believing that the interrogation related to his desire to seek asylum," misled him when they "refused to answer when he asked if anything was wrong," and misled him by making "clear indications to him that their questions were for his benefit." (Def's Suppl. Mem. 1–2). Osman argues that "[a]ffirmative deceit invalidates an accused's *Miranda* waiver where the accused 'inquire[s] about the nature of the investigation and the agents' failure to respond [i]s intended to mislead.'" (*Id.* at 17 (quoting *United States v. Mitchell*, 966 F.2d 92, 100 (2d Cir. 1992)).)

The Government argues that Osman's "actions and statements demonstrate that he was sufficiently proficient in English and thus that he could understand his *Miranda* rights and the consequences of waiving them." (Gov't Opp'n 5.) The Government contends that this is a purely fact-specific inquiry for the Court to resolve by "examin[ing] the totality of the circumstances evidencing [the] defendant's command of and competency in English," and by "consider[ing] whether [Osman's] proficiency in English was sufficient to enable [him] to understand the explanation of the *Miranda* rights and the consequences of waiving them." (*Id.*) The Government also argues that Osman was not misled about the purpose of the questioning. (Gov't Suppl. Opp'n 3.)

For the reasons discussed below, the Court concludes that the Government has met its burden to show, by a preponderance of the evidence, that Osman "voluntarily, knowingly, and intelligently" waived his *Miranda* rights. Osman had a "full awareness of both the nature of the right[s] being abandoned and the consequences of the decision to abandon [them]," *Moran*, 475 U.S. at 421, and his waiver was the product of a "free and deliberate choice," rather than

"intimidation, coercion, or deception."[13]  *Id.*  In sum, the "totality of the circumstances" reveals both "the requisite level of comprehension" and "an uncoerced choice" to support a finding that Osman's *Miranda* rights were validly waived.  *Id.* (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).

### i.   The record reflects the "requisite level of comprehension"

Osman argues that his "command of the English language was not sufficient for him to understand or waive his *Miranda* rights."  (Def.'s Suppl. Mem. at 11).  He argues that, contrary to demonstrating proficiency, "he affirmatively misstated his rights, and the law enforcement agents interviewing him did nothing to correct his misunderstanding."  (*Id.*)  Osman argues that his "rephras[ings]" of his *Miranda* rights reveal that he did not understand the "nature of the right[s] being abandoned and the consequences of the decision to abandon [them]."  (*Id.* (quoting *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011)).)  In support of his lack of English proficiency, Osman points to his difficulty answering questions, both during the *Miranda* waiver and during the subsequent questioning.  When informed by Agent Pierce that he had the right to remain silent, Osman contends that he responded, "I have the right to asylum."  (Def.'s Mot 2.)  After Agent Pierce summarized his *Miranda* rights as, "[y]ou have the right to not talk; you have the right to a lawyer," Osman responded, "I have the right to talk."  (Def.'s Suppl. Mem. 11.)  Shortly thereafter, during some preliminary questioning, Agent Pierce asked, "How long was the flight?"  Osman did not respond.  Agent Pierce repeated the question, asking, "How long was the airplane?" and mimicked the movement of a plane with her arm.  Osman responded, "Delta

---

[13]  The Court discusses Osman's argument that he was misled as to the purpose of the questioning, and therefore did not make a "free and deliberate choice" (*i.e.*, "an uncoerced choice"), in conjunction with Osman's contention that he believed the questioning related to his claim for asylum.

Airlines." (Def.'s Mot 3.) Finally, Osman contends that "[t]he remaining hour of the interrogation video shows [his] poor English comprehension." (Def.'s Suppl. Mem. 13.) He argues:

> At no point is [Osman's lack of English comprehension] clearer than during Officer Simon's tortured attempt to elicit an admission from Mr. Osman that Mr. Osman knew he was not authorized to live in the United States. Officer Simon asked Mr. Osman four times whether, in sum and substance, Mr. Osman knew that he needed proper authorization to have residency in the United States. During this exchange, Mr. Osman gave several nonresponsive answers and told Officer Simon twice that he did not understand.

(*Id.*)

The Government responds that Osman's "actions and statements demonstrate that he was sufficiently proficient in English and thus that he could understand his *Miranda* rights and the consequences of waiving them." (Gov't Opp'n 5.) In support, the Government points to *Amanor*, 2015 WL 13344076, and *United States v. Juvenile Male*, 968 F. Supp. 2d at 507. (*Id.* at 5–6.) In *Amanor*, the court denied suppression of statements made by a native of Ghana to agents at JFK airport after a substance suspected to be heroin was discovered hidden in packages of dried fish carried in her luggage. (*Id.* at 5 (citing *Amanor*, 2015 WL 13344076, at *1).) The court found that the defendant "spoke clearly and fluently in English" during her interview at the airport, never requested a translator, and answered "open-ended" questions "in narrative form" by "'telling a story,' which was followed by dialogue." (*Id.* (quoting *Amanor*, 2015 WL 13344076, at *2).) In *Juvenile Male*, the defendant, an alleged MS-13 member who primarily spoke Spanish, sought to suppress statements he made to law enforcement on the basis that the *Miranda* warning preceding his statements was given to him in English. (*Id.* at 5–6 (citing *Juv. Male*, 968 F. Supp. 2d at 507).) The court found that the defendant had "a reasonably good command of the English language," and that the government proved, by a preponderance of the

evidence, that his "English-language skills were sufficient to enable him to (1) knowingly, intelligently, and voluntarily waive his *Miranda* rights in English; (2) to be questioned in English; and (3) to sign off on statements that had been taken in English." (*Id.* (quoting *Juv. Male*, 968 F. Supp. 2d at 506, 508–09).)

Although Osman's English comprehension is imperfect, his command of the English language is proficient. The Court credits Officer Simon's testimony that he did not request an interpreter for Osman because "[d]uring the course of our interactions, I did not get the feeling from Mr. Osman that he did not understand what we were saying, and his responses reflected the questions that we were asking." (Tr. 14:11–20.) Further, Officer Simon testified that, "when [Osman] was communicating to me, his answers made coherent sense." (*Id.*) Like the defendant in *Amanor*, Osman never requested a translator and responded to "open-ended" questions "in narrative form."[14] *See* 2015 WL 13344076, at *2. In addition, Osman engaged in meaningful "dialogue" with Agent Pierce and Officer Simon related to his travel between Ghana and Libya, the reason why he had to leave Ghana for Libya, and about how he obtained his travel document from Nabil. *See id.* Like the defendant in *Juvenile Male*, Osman has a "reasonably good

---

[14] For example, in response to Agent Pierce's question, "Why did you move from Ghana to Libya?" Osman explained, "Because I have [a] problem in Ghana; that's why I moved. My problem [is] I [am] gay." Agent Pierce responded, "That's not a problem." Osman continued, "It is because, in our community, if we see that happening, I will probably be killed or something like that. So, one day they catch me with one guy, in a hotel, so I run to go to Burkina [Faso] after that, I go back to Libya." (GX 102 at 40:40–41:10.)

In an exchange with Officer Simon, Osman explained that he would enter Libya without a visa following a two-to-three-week journey through the Sahara: "You go to Burkina Faso, to Niger, and then to Tripoli. [. . .] It takes sometimes two weeks, three weeks. [. . .] We go in group; ten people, thirty, forty. We go together." Osman explained that the first stop in Libya was Qatrun, and "from Qatrun to Tripoli, it takes maybe one week, ten days, sometimes two weeks. [. . .] Usually, you take four cars, five cars, because one driver would take to their destination, and another driver would take you to another [gas] station, and from there to another station, and another." (*Id.* at 52:50–54:30.)

command of the English language."  968 F. Supp. 2d at 506.  For example, during the exchange between Osman and Officer Simon regarding Osman's glasswork in Libya, Osman understood Officer Simon's question, "like vases?" to be seeking clarity on the type of glasswork Osman performed.  Osman responded appropriately and clarified that he worked on construction glass, such as windows and dividing walls made of glass.  (*See* GX 102 at 55:45–56:10.)

Osman argues that this exchange is not a fair representation of his overall English comprehension because it is expected that he would be able to speak more cogently about his work, as a familiar topic and because he may have had to communicate in English for sales and business reasons.  (*See* Tr. 37:7–38:17.)  While Osman's argument has intuitive appeal, the Court finds that Osman's English proficiency for most of the questioning was roughly comparable to his exchange with Officer Simon about his glasswork business in Libya.  For example, Osman's explanation that he obtained the visa by providing Nabil his passport and a photo at a coffeeshop in Tripoli was equally coherent, and certainly not a subject with which the Court expects Osman to have any familiarity in English.

The Government argues that the fact that Osman indicated throughout the interrogation when he did not understand the question asked of him, demonstrates that he did understand and knowingly waive his *Miranda* rights.  (*See* Gov't Suppl. Opp'n 2; Gov't Suppl. Br. 7–8.)  In addition, the Government also implies that Osman selectively indicated a lack of comprehension and did so only on the most incriminating questions — and submits that this is further proof of his comprehension.  (Gov't Suppl. Br. 4–5.)  Although Osman displayed comprehension difficulty during the *Miranda* colloquy, he indicated to Agent Pierce and Officer Simon when he did not understand without using the phrase, "I don't understand" — as evidenced by Agent Pierce's and Officer Simon's efforts to clarify the meanings of various portions of the *Miranda*

warnings.

Prior to the *Miranda* colloquy, Osman stated that he both spoke and understood English. (GX 102 at 0:57–1:01.)  Throughout the *Miranda* warnings, Osman indicated when he did not understand and the agents further explained each warning in plain English.  Acknowledging the first right protected by the *Miranda* warnings, Osman stated, "I don't have to talk," which he rephrased himself as, "I have the right to remain silent."  (*Id.* at 1:18–1:30.)  Acknowledging that anything he said could be used against him, Osman stated, "I understand," and further responded, "Ahh, in the courts" — which would support the inference that Osman did not believe the questioning to be related to asylum.  (*Id.* at 1:30–2:00.)  Next, Osman recognized that the court would provide him with an attorney.  (*Id.* at 2:00–2:25 ("Oh, the court will give me [one]. Okay.").)  Finally, Osman indicated that he was willing to speak with the agents.  (*Id.* at 3:01–3:10 ("I can talk.").)  On this record, the Government has met its burden of showing by a preponderance of the evidence that Osman had "a full awareness of both the nature of the right[s] being abandoned and the consequences of the decision to abandon [them]."  *Moran*, 475 U.S. at 421; *compare Juv. Male*, 968 F. Supp. 2d at 508 n.9 ("[E]ach detective testified that he went through the *Miranda* rights and waivers line by line with the defendant, making sure that the defendant understood each line that was read to him before moving on to the next."), *with* (GX 102 at 0:57–3:10).

In sum, and paying particular attention to Osman's *Miranda* waiver, the Court finds that Osman's English comprehension was sufficient to enable him to waive his rights knowingly, intelligently, and voluntarily under *Miranda v. Arizona*.

### ii.   The record reflects an "uncoerced choice"

Osman first argues that he believed the questioning was related to his claim for asylum. (Def.'s Suppl. Mem 3.)  He contends that "at no point before or during the interrogation did the agents ever inform [him] that their questions were unrelated to asylum, nor that their questions related to a criminal investigation."  (*Id.* (citing Tr. 12:5–12, 34:17–25).)  Osman asserts that the agents' questions regarding the circumstances of his travel, the origin of his travel documents, why he came to the United States, and his plans upon arrival led him to believe that the questioning was related to his intent to seek asylum.  (*Id.* at 5.)  Osman also argues that his statements should be deemed involuntary because he was misled by Agent Pierce and Officer Simon as to the purpose of the questioning.  (*Id.* at 15.)  In support of his argument that he was misled, Osman contends that he was "affirmatively misled" in three ways.  First, the agents did not adequately identify themselves to Osman as law enforcement.  (*Id.*)  In addition to introducing herself as "Alison," and stating that she was with "the State Department," (*id.* (citing GX 102 at 0:21–0:35)), Osman contends that Agent Pierce "hastily" put away her credentials without displaying her badge — which was concealed underneath her credentials, (*id.* at 15–16).  Second, "during and immediately after the *Miranda* warnings, Agent Pierce made statements suggesting that the questioning was for Mr. Osman's benefit," including by saying that "[he] could just give [them] the same story [he] told" officers during his prior interactions — suggesting that he could reiterate the basis for his asylum claim, (*id.* at 16); that any statements he made to her could be used "*for* or against" him, (*id.*); and that she told him that she would "be able to write this up for" him — suggesting that she would be assisting with his asylum application, (*id.*).  Third, and finally, Osman asserts that he was "affirmatively deceived" by the agents' refusal to answer his question whether there was a problem.  (*Id.* at 17.)  Osman argues

that Agent Pierce's response that they were "just working through some stuff," was a "misrepresentation [that] materially induced [him] to make further incriminating statements." (*Id*. (citing *Mitchell*, 966 F.2d at 100).)

The Government argues that Osman was not misled about the purpose of the questioning. (Gov't Suppl. Opp'n 3.)  When asked to tell the "same story" he told officers earlier, "one would expect [Osman] to mention asylum and persecution — which he had earlier raised at both primary passport control and secondary inspection." (*Id*.)  Osman did not.  Accordingly, the Government contends that "there is no reasonable inference that [Osman] understood the interview to be related solely to his claim of asylum." (*Id*.)  In addition, the Government argues that "there is no requirement that [it] disclose in advance 'all the possible subjects of questioning,' and the failure to do so 'is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege.'" (*Id*. (quoting *Spring*, 479 U.S. at 577).)  In response to Osman's contention that he was misled as to the identity of the agents and the subject matter of the interview, the Government asserts that these issues are "not . . . 'constitutionally significant.'" (*Id.* (quoting *Spring*, 479 U.S. at 577).)  "To the contrary, '[t]he case law is clear that the [government is] not required to give [the] defendant all of the information regarding the interview before he waived his rights, including whether he was being criminally investigated and the true identity of the agents.'" (*Id*. (quoting *United States v. Oladokun*, No. 15-CR-559, 2016 WL 4033166, at *5 (E.D.N.Y. July 27, 2016)).)  The Government asserts that officers are permitted to make statements that are "'false, misleading, or intended to trick' — so long as the defendant's will is not 'overborne by the deception.'" (*Id*. at 4 (quoting *United States v. Ash*, 464 F. Supp. 3d 621, 629 (S.D.N.Y. 2020)).)  Finally, as to Osman's question about whether there were any problems, the Government argues that Agent

24

Pierce's response that they were "working through some stuff," did not overbear Osman's will or create any affirmative obligation to disclose the nature of the government's questioning.  (*Id*. (citing *Haak*, 884 F.3d at 410).)

For the following reasons, the Court concludes that Osman spoke voluntarily with Agent Pierce and Officer Simon and that his decision to speak was the product of an "uncoerced choice."  *Moran*, 475 U.S. at 421.  First, even if Osman believed the questioning was related to his claim for asylum, such a belief would not render his *Miranda* waiver invalid.  The law does not "require that [law enforcement] supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights," *Spring*, 479 U.S. at 576–77, nor is a suspect entitled to be "inform[ed] . . . of the potential subjects of interrogation," *id.* at 575; *see also id.* at 576 ("This Court has never held that mere silence by law enforcement officials as to the subject matter of an interrogation is 'trickery' sufficient to invalidate a suspect's waiver of *Miranda* rights, and we expressly decline so to hold today.").  Similarly, the Court finds that the agents' failures to identify themselves as law enforcement and to show their badges are within the category of information that the Supreme Court contemplated in *Spring*. *Id.* at 575 ("[A] valid waiver does not require that an individual be informed of all information 'useful' in making his decision or all information that 'might . . . affec[t] his decision to confess.'" (citation omitted)).

Second, Osman's belief that the agents may have been acting for his benefit did not deprive him of the right to discontinue speaking at any time, particularly when the questions began to focus on his visa.  *Spring*, 479 U.S. at 574 (noting that a defendant need only be aware that "he may choose . . . to discontinue talking at any time").  Agent Pierce's statement that she was just going to "write this up" for him may have "lull[ed Osman] into a false sense of security"

but "d[id] not rise to the level of compulsion or coercion." *United States v. Pryor*, 474 F. App'x 831, 835 (2d Cir. 2012) (quoting *Illinois v. Perkins*, 496 U.S. 292, 297 (1990)); *see also United States v. Basciano*, 634 F. App'x 832, 837 (2d Cir. 2015) (same). Third, Agent Pierce's and Officer Simon's failure to forthrightly answer his question about whether there was a problem did not rise to the level of "affirmative misrepresentations" by the agents that were "sufficiently coercive to invalidate [Osman's] waiver of the Fifth Amendment privilege" and that would warrant suppression of Osman's statements. *Anderson*, 929 F.2d at 100 (citing *United States v. Lynumn*, 372 U.S. 528, 534–35 (1963)); *see also United States v. Shehadeh*, 940 F. Supp. 2d 66, 73–76 (E.D.N.Y. 2012) (distinguishing *Anderson* where agent stated that the defendant's "ability to 'speak plainly,' 'face-to-face' with his 'case agent' . . . would evaporate when 'lawyers [got] involved,'" and finding that such statement came "as close to the line demarcated by *Anderson* as possible," but denying suppression because the statement "was actually true and was not misleading"). Officer Simon's response that he was "not going to be making any statements on that," and Agent Pierce's response that they were "just working through some stuff," are far from the affirmative misrepresentations in *Lynumn*, 372 U.S. at 534, that the suspect would be deprived of financial aid for her dependent child if she failed to cooperate, and *Anderson*, 929 F.2d at 100, that the suspect had to choose between his right to a lawyer or the option to cooperate. Thus, as in *Shehadeh*, Agent Pierce's and Officer Simon's statements do not constitute "affirmative representations" warranting suppression. 940 F. Supp. 2d. at 74 ("In *Anderson*, the government's 'affirmative representations,' . . . 'rendered [the defendant's] confession . . . involuntary as a matter of law.'" (citations omitted)). Finally, Osman's contentions do not rise to the level of "clear and convincing evidence that the [government] agents affirmatively misled [him] as to the true nature of [their] investigation." *United States v.*

*Kourani*, 6 F.4th 345, 351 (2d Cir. 2021) (alterations in original).  Osman, moreover, has not shown that "the misrepresentations materially induced [him] to make incriminating statements." *Mitchell*, 966 F.2d at 100.  Therefore, the Court finds that under the "totality of the circumstances," Osman made an "uncoerced choice" to speak with Agent Pierce and Officer Simon.  *Moran*, 475 U.S. at 421.

### III.   Conclusion

Based on the record before the Court and the "totality of the circumstances," the Court finds that Osman possessed "the requisite level of comprehension" of his *Miranda* rights and made "an uncoerced choice" to speak with Agent Pierce and Officer Simon.  *Moran,* 475 U.S. at 421.  Accordingly, the Court finds that Osman "voluntarily, knowingly and intelligently" waived his rights under *Miranda v. Arizona.*  384 U.S. at 444.  The Court therefore denies Osman's motion to suppress.

Dated: February 12, 2024
      Brooklyn, New York

SO ORDERED:

                                             /s MKB
                                    MARGO K. BRODIE
                                    United States District Judge